**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KEITH CARLTON CAMPBELL,

Plaintiff,

v.                                                          ACTION NO. 2:13cv431

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

Defendant.

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff Keith Carlton Campbell brought this action under 42 U.S.C. §§ 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. The undersigned recommends that the decision of the Commissioner be AFFIRMED.

## I. **PROCEDURAL BACKGROUND**

Mr. Campbell protectively applied for DIB and SSI on November 27, 2009, alleging

disability since September 1, 2007, caused by heart attack, asthma, high blood pressure, hemangioma in left foot, and depression.  R. 198, 205.[1]  Mr. Campbell's applications were denied initially and on reconsideration.  R. 46-87.  Mr. Campbell requested a hearing by an Administrative Law Judge (ALJ), which occurred on March 13, 2012.  R. 24-45.  Mr. Campbell was represented by counsel, and testified before the ALJ along with his fiancée, Kathy Hines, and a vocational expert.  R. 24-45.

On April 9, 2012, the ALJ found that Mr. Campbell was not disabled within the meaning of the Social Security Act. R. 20.  The Appeals Council denied Mr. Campbell's request for administrative review of the ALJ's decision.  R. 1-5.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

Mr. Campbell timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g). On December 20, 2013, Mr. Campbell moved for summary judgment.  ECF No. 16.  Defendant filed a cross-motion for summary judgment on January 14, 2014.  ECF No. 18.  As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND

Born in 1961, Mr. Campbell was forty-six years old on his alleged onset date of September 1, 2007, and fifty years old at the time of his administrative hearing and the ALJ's decision.  R. 11, 29.  Mr. Campbell graduated high school, and has past relevant work as an auto mechanic.  R. 19, 30, 41-42.  Mr. Campbell was born with a left foot hemangioma.  R. 35.

### A.    Medical Background

Mr. Campbell was admitted to the emergency room on August 29, 2007, with complaints

---

[1] The citations in this Report and Recommendation are to the Administrative Record. ECF No. 7.

of chest pain.  R. 259-66.  Chest x-rays and radiograph were all normal.  R. 261, 266.  An exercise stress test was negative, and an echocardiograph was negative for exercise induced myocardial ischemia.  R. 262.

Mr. Campbell was hospitalized for two days beginning September 1, 2007, for a myocardial infarction due to cocaine use.  R. 290-91.  A cardiac catheterization was performed without complication, which demonstrated no flow limiting coronary artery disease.  R. 296-97, 338.  Chest x-rays were normal, and the cardiologist found no significant coronary artery disease.  R. 297-98.  Mr. Campbell was discharged on daily aspirin and diltiazem, with instructions to discontinue cocaine use and smoking.  R. 291.

On December 21, 2007, Mr. Campbell reported chest pain and wheezing.  R. 304.  He was out of his inhaler.  R. 304.  Based on the results of x-rays, cardiac enzyme test, and a stress test, the doctor found a low probability of cardiac disease, and Mr. Campbell was discharged home on December 22, 2007, with Atenolol and an albuterol inhaler. R. 304-305, 307-312.

In the emergency room on February 1, 2008, Mr. Campbell reported that he had started wheezing the previous day after working in the attic.  R. 268.  Chest x-rays were normal.  R. 271.  He was discharged with a prescription for prednisone, and instructed to continue using his albuterol inhaler.  R. 270.

On March 7, 2008, Mr. Campbell was again admitted to the hospital with chest pain.  R. 317-19.  Chest x-rays were normal.  R. 337.  A cardiac catheterization was performed revealing coronary spasm, but no flow limiting coronary artery disease.  R. 333-34.  Mr. Campbell had an unremarkable physical examination.  R. 321.  With respect to his musculoskeletal examinations, perfusion and sensation were intact in all four extremities, he had good bilateral grip in his upper extremities, and good plantar flexion and extension in his lower extremities.  R. 329.  The doctor

noted that asthma was one possibility for Mr. Campbell's recurrent chest pain, and another possibility was musculoskeletal related to chest compressions and shocking that occurred in September 2007.  R. 326-27.  Mr. Campbell reported he was "able to walk reasonably well, he notes many miles, as long as 'he takes his inhaler.'"  R. 328.  Upon discharge on March 10, 2008, Mr. Campbell was diagnosed with chest pain, secondary to negative cardiac catheterization, Prinzmetal's angina, and asthma.  R. 323.  Mr. Campbell was advised to see a primary care physician for treatment of depression/anxiety, for management of his asthma, and the "very rare possibility of vasospastic coronary artery disease."  R. 327.  He was encouraged to pursue aerobic exercise, starting slowing and gradually progressing in intensity.  R. 321.

Mr. Campbell was admitted to the hospital on April 11, 2008, with chest pain.  R. 347. Cardiac catheterization again revealed evidence of coronary artery spasm, with normal coronary arteries.  R. 347.  A two-dimensional echocardiogram revealed normal systolic function with ejection fraction of 65 to 70%.  R. 348.

On September 8, 2008, Mr. Campbell was seen at the emergency room for asthma, shortness of breath, and a cough.  R. 471-75.  He was given albuterol and discharged the same day.  R. 474.

On October 15, 2008, Mr. Campbell was seen at the emergency room for wheezing accompanied by a dry cough.  R. 251-52.  He was out of his inhaler.  R. 252.   Mr. Campbell reported feeling 100% better after nebulizer treatments, and was discharged home.  R. 253.  A chest x-ray was normal.  R. 255.

Mr. Campbell was again given asthma medication at the emergency room on December 4, 2008, for wheezing.  R. 475-85.  Mr. Campbell was out of his albuterol, and denied chest pain. R. 477.  On February 4, 2009, Mr. Campbell was seen at the emergency room for wheezing after

running out of his inhaler, and again denied chest pain.  R. 485-96.  Mr. Campbell's blood pressure was high, and he was advised to see his "personal caregiver."  R. 495.

Mr. Campbell was seen at the emergency room for chest pain on February 20, 2009.  R. 274.   The chest discomfort resolved with intravenous nitroglycerin, and a left heart catheterization was performed.  R. 276.  Mr. Campbell's cardiovascular exam showed normal heart sounds with normal rate and regular rhythm, no gallop, friction rub or murmur.  R. 278.  His chest exam revealed normal breath sounds, normal effort, no respiratory distress, and no wheezes or rales.  R. 278.  Diagnostic x-rays were performed with no radiographic evidence of active cardiopulmonary disease.  R. 288.

On April 20, 2009, Mr. Campbell went to the emergency room with chest pain.  R. 496-514.  He reported nausea and vomiting.  R. 496.  Chest x-rays were normal.  R. 513.

Mr. Campbell was seen at the Beach Health Clinic on May 20, 2009, and was referred to podiatry for foot pain.  R. 524.

On June 11, 2009, Mr. Campbell reported to a Beach Health Clinic doctor that his left and right hands had started shaking about four months earlier, his left in the morning, and his right when writing.  R. 523.  The doctor noted Mr. Campbell was taking no new medications, the shaking was not associated with stress or anxiety, and there was no sign of Parkinson's.  R. 523.  Mr. Campbell was prescribed Primidone.  R. 523.

Mr. Campbell returned to Beach Health Clinic on June 17, 2009, due to a hemangioma on his left foot.  R. 521.  He was referred for an MRI.  R. 521.  On August 28, 2009, the doctor noted Mr. Campbell was born with a hemangioma and had surgery in 1973, which did not help the condition.  R. 519.  Mr. Campbell exhibited swelling in the foot and ankle, and decreased range of motion.  R. 519.  An MRI showed extensive hemangioma of the foot and ankle, and he

was referred for x-rays.  R. 519.

X-rays of Mr. Campbell's left foot taken on September 8, 2009, showed moderate hallux valgus deformity, moderate midfoot soft tissue swelling, irregular soft tissue calcifications along plantar aspect, benign bone lesion in the first digit, and hammertoe deformity of the second digit. R. 256, 528-29.  On September 17, 2009, Mr. Campbell was prescribed a "theraBoot" and anti-inflammatories.  R. 517.

On November 18, 2009, Mr. Campbell was seen at the Beach Health Clinic for a follow-up on his foot.  R. 516.  He reported the swelling and pain were much better, and he wanted to continue wearing the boot.  R. 516.

A state agency physician, Carolina Longa, M.D., reviewed Mr. Campbell's record in connection with Mr. Campbell's initial application, and on April 8, 2010, found he was capable of medium work.  R. 46-53.  Dr. Longa found Mr. Campbell could stand or walk for six hours in an eight-hour day, sit for six hours in an eight-hour day, occasionally lift up to fifty pounds, and frequently lift and carry twenty pounds.  R. 49-50.  Dr. Longa found these exertional limitations necessary due to Mr. Campbell's history of myochardial infarction, and moderate hallux valgus deformity of the foot, as well as foot swelling.  R. 50.  Dr. Longa also found Mr. Campbell must avoid even moderate exposure to fumes, odors, dusts, and gases due to his history of asthma.  R. 50.  Dr. Longa concluded Mr. Campbell was capable of performing his past work as an auto mechanic.  R. 52.

Mr. Campbell experienced chest pain on April 19, 2010.  R. 654.  Chest x-rays were normal.  R. 541.  The doctor found there was no active cardiopulmonary disease.  R. 659.  He was discharged home in stable condition.  R. 661.

On April 29, 2010, Mr. Campbell was referred to Cardiovascular Specialists for follow-

up after being evaluated in the emergency room for chest pain.  R. 336-39.  Calin V. Maniu, M.D., found the symptoms did not suggest myocardial ischemia as the symptoms persisted for hours at a time, and were not musculoskeletal because they did not get worse with pressure application.  R. 339.  Dr. Maniu stated the diagnostic workup was limited due to Mr. Campbell's lack of medical insurance, and he would be treated for presumed coronary artery disease and hypertension until further testing became necessary.  R. 339.

On January 27, 2011, Mr. Campbell was given a referral to Western Tidewater Community Services Board ("Western Tidewater") due to hallucinations.  R. 554, 560.

Virgil Melvin, M.D., with the Virginia Department of Rehabilitative Services, examined Mr. Campbell on February 7, 2011, and produced a Medical Consultant Report.  R. 542-46.  Dr. Melvin noted that Mr. Campbell had experienced pain in his left foot since he was a child, and that the pain was sharp with constant throbbing, which he rated at an eight out of ten.  R. 543.  Mr. Campbell denied smoking tobacco "now and ever," admitted to cocaine use six to seven years prior, and admitted to drinking "about a 6-pack every other day."  R. 544.  Mr. Campbell was wearing a left foot and leg boot, which caused an abnormal gait, but was not using an assistive device.  R. 544-45.  He had hammertoes, mild bunions, and a decreased range of motion in his ankle.  R. 545, 547.  All other range of motion testing was normal.  R. 547.  Mr. Campbell had some audible wheezing, but no increased respiratory rate, no rales, and no rhonci.  R. 544-45.  Mr. Campbell reported he had depression.  R. 546.  Dr. Melvin noted that his depression was not being treated, and that Mr. Campbell had a normal affect through the examination.  R. 544, 546.

Dr. Melvin found Mr. Campbell did not "demonstrate any major sources of decreased functionality, with the exception of his right foot pain and decreased range of motion

deformities."[2]  R. 546.   Based on his evaluation, Dr. Melvin found Mr. Campbell could stand and or walk for about two hours with frequent breaks, and may need an assistive device to walk long distances.  R. 546.  Mr. Campbell could sit without restriction.  R. 546.  He could lift and carry twenty pounds occasionally, and lift and carry ten pounds frequently, due to his left foot deformity and inability to bear too much weight.  R. 546.  He would be limited in bending, stooping, climbing and balancing, but would have no manipulative or environmental restrictions. R. 546.

State agency physician Leopold Moreno, M.D., reviewed Mr. Campbell's record in connection with Mr. Campbell's request for reconsideration, and submitted a disability determination on March 4, 2011.  R. 64-74.  Dr. Moreno agreed with the assessment of Dr. Longa that Mr. Campbell was capable of medium work, and capable of performing his past relevant work as an auto mechanic.  R. 70-71, 74.  In making this determination, Dr. Moreno found that Dr. Melvin's opinion relied heavily on Mr. Campbell's subjective report of symptoms and limitations, and the opinion was not supported by the totality of the evidence.  R. 72.  Dr. Moreno found that Mr. Campbell's "bunion/hammertoe deformity may currently cause him some discomfort when moving about (walking, standing, stair climbing); however, with treatment (change in shoe gear, orthotics such as padding, cushions, toe separators), he should be able to have an active lifestyle."  R. 70.

State agency psychologist Kim Zweifler, Ph.D., also reviewed Mr. Campbell's record, and submitted a disability determination with respect to Mr. Campbell's mental condition on March 4, 2011.  R. 64-70.  Dr. Zweifler noted that Mr. Campbell alleged depression for the first time in February 2011, and that he had not been in treatment for a psychiatric issue before.  R.

---

[2] As noted by the ALJ, the reference to *right* foot pain must have been a typographical error, as the evidence relied upon related to Mr. Campbell's *left* foot deformities.  R. 18.

69.  Dr. Zweifler found the record did not establish any mental medically determinable impairment.  R. 69.

On March 17, 2011, Mr. Campbell met with a clinician at Western Tidewater for his initial screening.  R. 664-67.  Notations indicate Mr. Campbell was referred because he had reported hallucinations, hearing voices for two to three years.  R. 667.  During the screening, Mr. Campbell reported that, over the past year, he had felt confused, had trouble concentrating, felt sad and depressed, and had racing thoughts.  R. 665.  He denied suicidal or homicidal thoughts, denied a history of taking psychotropic medication, and denied hearing voices, but reported having thoughts in his head that were telling him he was a loser.  R. 665.  He had trouble falling asleep and staying asleep, and had gone one to two days without eating.  R. 665.  He stated he often did not complete household chores and had skipped bathing and grooming due to depression.  R. 665.  Mr. Campbell was encouraged to follow up with his primary care physician to discuss a prescription for an anti-depressant.  R. 666.

On September 30, 2011, Mr. Campbell was treated in the emergency room for a rash.  R. 622-27.  A notation indicated he ambulated independently.  R. 627.

On October 7, 2011, Mr. Campbell was treated in emergency room for a right ankle sprain.  R. 638-40.  His treatment notes indicate Mr. Campbell was able to ambulate independently with a normal gait, and "can perform all activities of daily living without assistance."  R. 643.  X-rays indicated no fracture or dislocation.  R. 653.  Mr. Campbell was prescribed Percocet and Ibuprofen.  R. 640.  His pain, which he rated as a ten out of ten, decreased to a zero out of ten following medication.  R. 644.

On January 10, 2012, Mr. Campbell was prescribed predisone tablets and hydrocortisone cream for right foot and ankle pain following injury in October 2011.  R. 566-67.  On

examination, both of Mr. Campbell's ankles were swollen. R. 566.

### B. The Administrative Hearing – March 13, 2012

Mr. Campbell testified at his administrative hearing that he lived with his fiancée, and that he did not drive. R. 29-30. Mr. Campbell worked off and on, from 2004 through 2007, as an auto mechanic for Meineke. R. 32-33. Mr. Campbell had not worked since 2007, and had not used cocaine since that time. R. 30-31. He quit drinking alcohol three months prior to the hearing, at which that time he was drinking a six-pack each day. R. 32. He was supported by his family. R. 30-31.

Mr. Campbell testified he was unable to work due to constant pain in his foot, bad chest pains, and an inability to concentrate on even simple things. R. 32. The medication he took for his chest pains and asthma left him feeling like a zombie all day. R. 30. He took Nitroglycerin approximately two times a week for his chest pain, and the medication caused headaches that could last for hours. R. 33-34. Sometimes, he would be sensitive to light and noise, and would sit in his room. R. 30. Mr. Campbell took heart medication daily that made him drowsy and caused headaches, though these were worse when he took Nitroglycerin. R. 37-38. Mr. Campbell testified he could walk five to fifteen minutes, or sit for that period of time, before experiencing chest pains. R. 34. He could read for five to six minutes before experiencing symptoms requiring him to stop. R. 36.

In addition, Mr. Campbell had problems with his foot, a hemangioma, since birth, but the constant throbbing had gotten worse. R. 35. The doctors indicated he could wear the brace and take pain medication. R. 37. The only other option was amputation above the knee. R. 37. When prompted by his attorney, Mr. Campbell also testified that his hands shook, making it difficult for him to write. R. 35-36.

Mr. Campbell's fiancée, Kathy Hines, testified that they had lived together since 2005. R. 39.  She testified that Mr. Campbell's medication caused headaches, and caused him to be sensitive to light.  R. 40.  Ms. Hines testified that she did the driving, housework, and cooking, and Mr. Campbell could not help with this due to his hands shaking. R. 40.

A vocational expert, Ms. Day, testified that Mr. Campbell's past work as a tire changer was semi-skilled, heavy work.  R. 42.  The ALJ asked whether jobs would be available for a hypothetical person with the same age, education and work experience as Mr. Campbell who would be limited to light work; occasional use of ladders, ropes or scaffolds; less than moderate exposure to fumes, dust, gas and other environmental irritants; and, no heights and hazards.  R. 42.  Ms. Day testified the jobs of office helper, mail clerk, and warehouse checker would be available for such a person.  R. 43.  The ALJ asked a second hypothetical about jobs available to a person with the same limitations, except limited to sedentary as opposed to light work.  R. 42.  The ALJ testified jobs would be available as a charge account clerk, food and beverage clerk, and document preparer.  R. 43.

### C.     The ALJ's Decision – April 9, 2012

The ALJ found Mr. Campbell had not been disabled, as defined by the Social Security Act, from September 1, 2007, through the date of the decision.  R. 20.  Mr. Campbell met the insured status requirement through March 31, 2011. R. 13.  At step one of the five-step analysis, the ALJ concluded that Mr. Campbell had not engaged in substantial gainful activity since September 1, 2007, the alleged onset date.  R. 13.  At step two, the ALJ found that Mr. Campbell's coronary artery disease, asthma and alcohol abuse were severe impairments.  R. 13.  The ALJ found Plaintiff's other impairments, including hypertension, depression, a left foot bunion/hammertoe, hyperlipidemia, and a history of cocaine abuse were non-severe. R. 14.  At

11

the third step, the ALJ concluded Mr. Campbell did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 14-15.

The ALJ found Mr. Campbell had the residual functional capacity ("RFC") to perform a limited range of light work. R. 15.  In reaching this conclusion, the ALJ summarized Mr. Campbell's testimony regarding his symptoms, including pain. R. 16.  The ALJ found Mr. Campbell's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible.  R. 16.

The ALJ next summarized the medical history, including the consultative examination. R. 16-17.  The ALJ assigned moderate weight to the opinion of the consultative examiner that Mr. Campbell could stand or walk for two hours, would need an assistive device for long distances, and could lift or carry twenty pounds occasionally and ten pounds frequently.  R. 18. The ALJ assigned significant weight to the opinions of the state agency consultants' physical assessments, because they were consistent with the mild objective clinical findings and the conservative course of treatment.  R. 18.  The ALJ concluded Mr. Campbell could "perform a limited range of light work.  R. 18-19.   Accordingly, the ALJ found Mr. Campbell was not capable of performing any of his past relevant work at step four.  R. 20.  The ALJ found at step five that, with Mr. Campbell's age, education, and residual functional capacity, there were jobs that exist in the national economy he can perform, such as office helper, mail clerk and warehouse checker, charge account clerk, food and beverage order clerk, and document preparer. R. 20.

Mr. Campbell argues (1) there is not substantial evidence in the record to support the ALJ's RFC finding; (2) the ALJ's finding that Mr. Campbell's mental impairments were not

severe is not supported by the record, and (3) the ALJ's hypothetical did not accurately described all of Mr. Campbell's work-related limitations. Pl.'s Mem. 5-23.  The undersigned disagrees, finding there is substantial evidence in the record to support the ALJ's decision, and recommending that the decision of the Commissioner be AFFIRMED.

### III.  <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.   *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the [Secretary's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th

Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## IV. ANALYSIS

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or

negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

### A.  Substantial Evidence in the Record Supports the ALJ's RFC Assessment

Mr. Campbell argues the ALJ's RFC assessment is not based on substantial evidence because the ALJ did not consider Mr. Campbell's impairments stemming from his chronic left foot deformity when formulating the RFC (Pl.'s Mem. 6); the RFC finding is directly contradicted by the opinion of the consultative examiner (Pl.'s Mem. 6-13); the ALJ's analysis of Mr. Campbell's complaints of pain are inconsistent with Fourth Circuit precedent (Pl.'s Mem. 13-17); and, the ALJ would have had to find Mr. Campbell was disabled as a matter of law if Mr. Campbell was only capable of sedentary work (Pl.'s Mem. 18).  The undersigned finds the ALJ considered the relevant evidence, made the proper analysis, and explained the weight he assigned to the opinion evidence; therefore, there is substantial evidence to support the ALJ's RFC assessment.

The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC.  20 C.F.R. §§ 404.1545(a).  The RFC is a claimant's maximum ability to work despite his limitations.  *Id.* at 404.1545(a)(1).  The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1545(a)(3).[3]

In making the RFC determination, the ALJ must consider the objective medical evidence

---

[3] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptom affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

in the record, including the medical opinions.   Under the applicable regulations, the ALJ is required to explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, State agency consultants, and other nonexamining sources.   20 C.F.R. § 416.927(e)(2)(ii).   Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Soc. Sec. Rul. 96-2, 1996 WL 374188, at *5.

### 1. The ALJ Properly Considered and Assigned Weight to the Consultative Examiner's Opinion

Mr. Campbell asserts the RFC finding that he was capable of light work is directly contradicted by Dr. Melvin's opinion that Mr. Campbell was limited to sedentary work as a result of his foot condition (Pl.'s Mem. 6-13); and, that the ALJ would have had to find Mr. Campbell was disabled as a matter of law if he accepted Dr. Melvin's opinion that Mr. Campbell was only capable of sedentary work (Pl.'s Mem. 18).   Mr. Campbell asserts the ALJ's rejection of portions of Dr. Melvin's opinion constitutes reversible error.   Pl.'s Mem. 13.   The undersigned does not agree.

After summarizing Mr. Campbell's medical history, the ALJ discussed the opinion evidence from consultative examiner Dr. Melvin.   R. 18.   The ALJ noted that Dr. Melvin found Mr. Campbell did not demonstrate any major sources of decreased functionality with the exception of his foot.   R. 18.   Further, the ALJ discussed Dr. Melvin's finding that Mr. Campbell could stand and walk for two hours, may need an assistive device for walking long distances, and could lift and carry twenty pounds occasionally and ten pounds frequently.   R. 18.   The ALJ

assigned moderate weight to Dr. Melvin's opinion, because the limitations of standing and walking for two hours and use of a cane for long distances were not supported by the medical record, and appear to be based on Mr. Campbell's subjective complaints. R. 18; *See Craig*, 76 F.3d at 590 (finding an ALJ was justified in rejecting the opinion of a treating physician, which was based on subjective complaints of pain).

There is substantial evidence in the record to support the ALJ's assignment of moderate weight to Dr. Melvin's opinion. While Mr. Campbell was born with a left foot hemangioma, there is no evidence that he sought treatment for a foot impairment until May 2009, despite an alleged disability onset date of September 1, 2007. R. 524. In fact, in March 2008, Mr. Campbell reported the ability to walk reasonably well for many miles as long as he took his inhaler. R. 328.

In June 2009, Mr. Campbell exhibited swelling in his left foot and ankle with decreased range of motion, and an MRI showed extensive hemangioma. R. 519. X-rays taken in September 2009 showed moderate hallux valgus deformity, moderate midfoot soft tissue swelling, irregular soft tissue calcifications along plantar aspect, benign bone lesion in the first digit, and hammertoe deformity of the second digit. R. 256, 519, 528-29. Mr. Campbell was prescribed a "theraBoot" and anti-inflammatories. R. 517. Mr. Campbell continued to wear the boot in November 2009, reporting his swelling and pain were much better. R. 516. He was also wearing the boot during his consultative examination with Dr. Melvin in February 2011. R. 544-45.

There are no further treatment notes for Mr. Campbell's left foot, although a notation was made that his left ankle was swollen in January 2012, when he was treated for a *right* ankle sprain. R. 566. In September 2011, he was seen in the emergency room for a rash, and a

17

notation was made that he "ambulated independently." R. 627. Further, when Mr. Campbell was treated in the emergency room for a *right* ankle sprain in October 2011, treatment notes indicate he was able to ambulate independently with a normal gait, and could "perform all activities of daily living without assistance." R. 643. There is also no indication in the record that Mr. Campbell was ever prescribed, or ever used, a cane or other assistive device.

While Dr. Melvin had the opportunity to examine Mr. Campbell on one occasion, he was not a treating physician; therefore, his opinion could not be entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d)(2). Instead, Dr. Melvin's opinion is one part of the record, which the ALJ must consider in determining Mr. Campbell's RFC. *See* 20 C.F.R. § 404.1527(d)(2)-(6). In this case, in addition to the relatively few treatment notes relating to Mr. Campbell's left foot, Dr. Melvin's opinion that Mr. Campbell was limited to sedentary work as a result of his foot disorder is contradicted by two state agency physicians. Dr. Longa reviewed Mr. Campbell's record in April 2010 (R. 46-53), and specifically discussed the moderate hallus valgus deformity of Mr. Campbell's left foot, as well as the foot swelling. R. 50. Nevertheless, Dr. Longa found Mr. Campbell was capable of standing or walking up to six hours in an eight-hour day. R. 50. Dr. Moreno reviewed Mr. Campbell's record in March 2011 (R. 64-74), and agreed with the assessment of Dr. Longa that Mr. Campbell was capable of medium work. R. 70-71, 74. Dr. Moreno found that Dr. Melvin's opinion relied heavily on Mr. Campbell's subjective report of symptoms and limitations, and Dr. Melvin's opinion was not supported by the totality of the evidence. R. 72. He further found that Mr. Campbell's "bunion/hammertoe deformity may currently cause him some discomfort when moving about (walking, standing, stair climbing); however, with treatment (change in shoe gear, orthotics such as padding, cushions, toe separators), he should be able to have an active lifestyle." R. 70.

18

Due to the relatively few medical records related to Mr. Campbell's left foot impairment, the conservative treatment prescribed for his condition, the absence of any indication that Mr. Campbell was ever prescribed an assistive device to ambulate, and the two opinions from the state agency physicians, there is substantial evidence in the record to support the ALJ's decision to discount Dr. Melvin's opinion, and to find Mr. Campbell capable of a range of light work.

**2.      The ALJ Properly Considered Mr. Campbell's Foot Impairments in Determining His RFC**

Plaintiff asserts the RFC assessment is deficient due to the ALJ's failure to consider Mr. Campbell's impairments stemming from his chronic left foot deformity when formulating the RFC.  Pl.'s Mem. 6.  The ALJ did consider Mr. Campbell's left foot impairment, specifically stating:

> X-rays of the claimant's left foot from September 08, 2009 showed a moderate hallux valgus deformity, moderate midfoot soft tissue swelling and irregular soft tissue calcifications along the plantar aspect of the foot, a benign bone lesion in the distal phalanx of the first digit, and a hammertoe deformity of the second digit (Exhibit B1F, p. 7). The claimant underwent two foot surgeries. He presented for a consultative examination on February 05, 2011 wearing a boot on his left foot. He had decreased range of motion in his left ankle, but examination of [h]is extremities was otherwise normal (Exhibit B7F). On January 10, 2012, the claimant had full range of motion with pain (Exhibit B9F, p. 14).

R. 14.  The ALJ noted Mr. Campbell testified that "he had constant pain in his foot."  R. 16.  The ALJ further considered the medical opinion of Dr. Melvin that Mr. Campbell "did not demonstrate any major sources of decreased functionality with the exception of his right foot," R. 18, and the opinions of Drs. Longa and Moreno that even with his foot condition, Mr. Campbell was able to perform medium work.  R. 18.  Accordingly, Mr. Campbell's argument that the ALJ did not consider his foot deformity in formulating an RFC is unpersuasive.  The ALJ appropriately addressed the medical records and medical opinions related to Mr. Campbell's

foot impairment.

### 3. The ALJ Properly Considered Mr. Campbell's Subjective Complaints

Mr. Campbell asserts the ALJ failed to properly analyze his complaints of chest pain and medication side effects, which prohibit him from performing the significant standing and walking necessary to perform light work. Pl.'s Mem. 13-17.

The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* In doing so, the ALJ must consider all relevant medical evidence in the record. *Id.* If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individuals' ability to work. *Id.* at 595. The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96. Social Security Ruling 96-7p states that the evaluation of a Plaintiff's subjective complaints must be based on consideration of all the evidence in the record, including, but not limited to: (1) medical and laboratory findings; (2) diagnoses and medical opinions provided by treating or examining physicians and other medical sources; and (3) statements from both the individual and treating or examining physicians about the claimant's medical history, treatment, response, prior work record, and the alleged symptoms' effect on the ability to work.

Mr. Campbell testified that he cannot concentrate on even simple tasks due to his left foot constantly throbbing, and his bad chest pains. R. 32, 35. He testified the medication he takes

daily for his heart makes him drowsy and causes headaches, and that the headaches are worse when he takes Nitroglycerin for chest pain, which happens approximately two times each week. R. 33-34, 37-38.  He testified he could walk five to fifteen minutes, or sit for that period of time, before experiencing chest pain, and could read for five to six minutes before his symptoms required him to stop.  R. 34, 36.

The ALJ found that Mr. Campbell's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Mr. Campbell's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the ALJ's RFC assessment.[4]  R. 16.  In reaching the determination regarding Mr. Campbell's credibility, the ALJ appropriately evaluated the evidence in the record.  The ALJ found Mr. Campbell's allegations of pain were not supported by the objective clinical findings or the conservative course of treatment, and were not corroborated by any medical opinion in the record.  R. 18.  The ALJ discussed that Mr. Campbell's heart disease and asthma were managed with medication.  R. 17.

A review of the record with respect to Mr. Campbell's chest pain reveals that Mr. Campbell suffered a myocardial infarction due to cocaine use in September 2007.  R. 290-91. Thereafter, Mr. Campbell took heart medication, and experienced some coronary spasms, but

---

[4] The ALJ's finding that that Plaintiff's statements were "not credible to the extent they [were] inconsistent with" the ALJ's RFC assessment is unfortunate.  This language appears as boilerplate language in any number of decisions by ALJs throughout the United States. *See e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).  This language is problematic because it implies that an RFC determination was made prior to a determination of Plaintiff's credibility, when the RFC determination should be made with all available evidence, including the credibility determination. *See* 20 C.F.R. § 404.1529(c)(4); *see also Bjornson*, 671 F. 3d at 645 ("A deeper problem is that the assessment of a claimant's ability to work will often . . . depend[] heavily on the credibility of her statements."). However, where, as here, the ALJ properly performed his credibility assessment, remand is not necessary.  *See Soghoian v. Colvin*, No. 1:12cv1232, 2014 WL 996530, at *9 (E.D. Va. Mar. 13, 2014) (holding remand is not necessary where "it is clear that the ALJ followed the appropriate two-step process and performed the credibility assessment as part of the overall RFC assessment"); *Racey v. Astrue*, 2013 WL 589223, at *6 (W.D. Va. Feb. 13, 2013) (holding that, despite boilerplate language, ALJ provided sufficient support for his RFC finding and determination of plaintiff's credibility).

never required stents or surgery.  Mr. Campbell was seen in the emergency room due to chest pain in December 2007, March 2008, and April 2008.  R. 304, 317, 347.  Objective testing consisting of x-rays, cardiac enzyme testing, stress test, and cardiac catheterization showed evidence of coronary artery spasm on two occasions, but otherwise showed all normal results and no evidence of flow limiting coronary artery disease.  R. 304-305, 307-312, 333-34, 337, 347.

Eleven months passed before Mr. Campbell was seen at the emergency room in February 2009, reporting chest pain that resolved with intravenous nitroglycerin.  R. 276.  Examination and x-rays showed all normal results.  R. 276-88.  Mr. Campbell was seen for chest pain in April 2009 (R. 496-514), and then another year passes before Mr. Campbell goes to the emergency room with chest pain in April 2010.  R. 654.  Test results were normal.  R. 659.

Mr. Campbell was seen numerous times in the emergency room for asthma related symptoms after running out of his asthma medication.  R. 251, 268, 304, 471, 475, 485.  His symptoms improved following medication, and he was discharged home.  R. 307-312, 270, 474, 253, 484, 495-96,

Following a consultative examination of Mr. Campbell and a review of Mr. Campbell's medical records, Dr. Melvin did not find that Mr. Campbell's heart condition or asthma were a source of decreased functionality.  R. 546.  Drs. Longa and Moreno found Mr. Campbell's medically determinable impairments included asthma, ischemic heart disease, and acute myocardial infarction.  R. 48, 69.  Despite these impairments, they concluded Mr. Campbell was capable of performing medium work.  R. 49-50, 70-71.

The ALJ found that, giving Mr. Campbell's complaints of pain and fatigue the full benefit of the doubt, and considering his history of heart attack, asthma, and consistent

complaints of chest pain, Mr. Campbell was limited to a range of light work.  R. 18.  The ALJ

conducted the proper analysis of Mr. Campbell's subjective complaints.  The ALJ considered the

medical and laboratory findings, the diagnoses and medical opinions, and the statements from

Mr. Campbell. *See* Soc. Sec. Rul. 96-7p (1996).  Accordingly, the ALJ's analysis was proper,

and substantial evidence supports the finding that Mr. Campbell's subjective complaints were

not credible to the extent they prohibited him from performing a limited range of light work.

**B.     The ALJ Did Not Commit Reversible Error in Assessing Mr. Campbell's Mental Impairment**

Mr. Campbell asserts the ALJ erred in finding Mr. Campbell's mental impairment was

"not severe," in failing to consider the mental impairment when formulating his RFC, and in

failing to include the appropriate limitations in the hypothetical to the vocational expert.  Pl.'s

Mem. 19-21.  At the second step of the sequential analysis, the ALJ must determine whether the

claimant has a severe impairment.  *See* 20 C.F.R. § 404.1520.  An impairment is severe if it

"significantly limit[s] your physical or mental ability to do basic work activities."  20 C.F.R.

§ 404.1521(a).  An impairment is not severe if it "has such a minimal effect on the individual

that it would not be expected to interfere with the individual's ability to work." *Evans v.*

*Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1982).

The evidence in the record shows Mr. Campbell was never prescribed medication for a

mental impairment, and only sought treatment for a mental impairment in January and March

2011.  In March 2008, upon discharge from the hospital following chest pain, Mr. Campbell was

advised to see a primary care physician for treatment of depression/anxiety.  R. 327.  There is no

evidence Mr. Campbell sought treatment at that time.   In January 2011, Horizon Health Services

referred Mr. Campbell to Western Tidewater due to his report of hallucinations.  R. 554, 560.

This occurred two weeks prior to his consultative examination with Dr. Melvin in February

2011.  R. 546.  Dr. Melvin noted Mr. Campbell had a normal affect throughout the examination, and did not find Mr. Campbell demonstrated decreased functionality as a result of depression.  R. 546.  On March 4, 2011, state agency Kim Zweifler, Ph.D., similarly found the record did not establish any medically determinable mental impairment.  R. 69.

Mr. Campbell met with a clinician at Western Tidewater on March 17, 2011.  R. 666. Mr. Campbell was referred because he had reported hallucinations, hearing voices for two to three years; however, during the evaluation he denied that he heard voices, but stated he had thoughts in his head that were telling him he was a loser.  R. 665-67.  Mr. Campbell reported feeling confused and sad, having trouble concentrating, having trouble sleeping, and having racing thoughts.  R. 665.  He denied suicidal or homicidal thoughts.  R. 665.  He reported going one to two days without eating, not completing household chores, and skipping bathing and grooming due to depression.  R. 665.  Mr. Campbell was encouraged to follow up with his primary care physician to discuss a prescription for an anti-depressant.  R. 666. There is no indication Mr. Campbell ever received medication for depression, or sought further treatment.

Though the ALJ found Mr. Campbell's depression was a non-severe impairment due to no evidence of significant treatment for the impairment, he found Mr. Campbell had several other severe impairments and continued with the sequential evaluation process.  R. 13-14. Substantial evidence exists in the record to support the ALJ's finding that Mr. Campbell's depression was not a severe impairment as there is no evidence in the record that Mr. Campbell's depression significantly limited his ability to work.

At step three of the sequential evaluation process, the ALJ had to determine whether Mr. Campbell had an impairment or combination of impairments that met or equaled a listed impairment.  20 C.F.R. § 404.1520.  In addressing Mr. Campbell's mental impairment, the ALJ

found Mr. Campbell had no restrictions in activities of daily living, no difficulty in social functioning, and no episodes of decompensation.  R. 14-15.  The ALJ found Mr. Campbell had moderate difficulties with regard to concentration, persistence or pace, as he reported problems with his concentration.  R. 15.  However, the ALJ found there was no record of any objective clinical findings to support a marked limitation in these areas.  R. 15.

Mr. Campbell argues the ALJ erred by failing to include in his RFC assessment and hypothetical to the vocational expert that Mr. Campbell suffers from moderate difficulties with regard to concentration, persistence or pace.  Pl.'s Mem. 20-21.  Mr. Campbell is correct that the ALJ was required to consider all of Mr. Campbell's medically determinable impairments when determining Mr. Campbell's RFC, regardless of whether those impairments were labeled severe or non-severe at step two of the sequential analysis.  *See* 20 C.F.R. § 416.945(a)(2).  *See also Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (discussing the necessity to address nonsevere mental impairments when making the RFC assessment).  Despite the ALJ's statement that his RFC assessment "reflects the degree of limitation the undersigned has found in the [] mental function analysis," R. 15, the RFC assessment does not contain any discussion of limitations related to Mr. Campbell's mental impairment.  However, where, as here, the evidence does not support a finding of functional limitations due to a mental impairment, the failure to conduct the step four analysis of mental function constitutes harmless error.  *See Alvey v. Colvin*, 536 Fed. Appx. 792, 794 (10th Cir. Aug. 28, 2013) (holding the ALJ committed harmless error by failing to engage in any analysis of mental impairments at step four after finding no more than minimal limitations due to mental impairments at step two).

There is no evidence in the record that Mr. Campbell's mental impairment significantly affects his ability to work.  Mr. Campbell's own testimony regarding his difficulty concentrating,

was stated in the context of discussing his physical impairments.

> The reason why I'm unable to work, Your Honor, because I'm in constant pain. My foot never, never, ever stops hurting. I have bad chest pains. I can't even concentrate on simple things sometimes. What good would I be on somebody's job if I can't even do that?

R. 32. Neither Mr. Campbell, nor his fiancée, ever mentioned Mr. Campbell's depression during his administrative hearing. There are few references to depression in Mr. Campbell's medical record, and fewer references to Mr. Campbell seeking treatment for depression or symptoms from depression. Accordingly, because the evidence does not support a finding of functional limitations due to mental impairment, the ALJ's failure to discuss Mr. Campbell's mental impairment when conducting his RFC analysis, and when crafting his hypothetical to the vocational expert, was harmless error. *See Morgan v. Barnhart*, 142 F. App'x 716, 721 (4th Cir. Aug. 5, 2005) (finding if ALJ's rejection of doctor's opinion was error, it was harmless error).

## V.  <u>RECOMMENDATION</u>

For the foregoing reasons, the Court recommends that Mr. Campbell's Motion for Summary Judgment (ECF No. 16) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 18) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## VI.  <u>REVIEW PROCEDURE</u>

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A

party may respond to any other party's objections within fourteen (14) days after being served

with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) of the

Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules).

2. A district judge shall make a *de novo* determination of those portions of this report or

specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and

recommendations set forth above will result in waiver of right to appeal from a judgment of this

court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985);

*Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir.

1984).

_____/s/_____

Tommy E. Miller

United States Magistrate Judge

Norfolk, Virginia
July 8, 2014